## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| **REBECCA W. MURPHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| v. | ) | **CIVIL NO. 3:11-cv-702-JAG** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Rebecca W. Murphy ("Plaintiff") is 52 years old and has worked as a launderer, school bus driver and courier. She alleges that she suffers from multiple sclerosis ("MS"), a herniated disc in her neck, depression, degenerative disc disease and carpal tunnel syndrome. On June 1, 2008, Plaintiff protectively applied for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") with a disability onset date of March 1, 2007 — later amended to September 29, 2007 — under the Social Security Act (the "Act"). Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. On October 25, 2010, the Appeals Council remanded Plaintiff's claim to the ALJ for the testimony of a vocational expert ("VE"). The ALJ held another hearing and again denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on August 8, 2011.

Plaintiff now challenges the ALJ's denial of DIB benefits, asserting that the ALJ should have assigned controlling weight to the opinions of Plaintiff's treating neurologist and

improperly evaluated Plaintiff's credibility. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 8-15.) In his decision, the ALJ refused to assign controlling weight to Plaintiff's treating neurologist's opinions, because they were not supported by the medical records. (R. at 27-28.) The ALJ also assessed the credibility of Plaintiff based on Plaintiff's medical records, activities of daily living ("ADLs") and daily marijuana use. (R. at 27.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe for review.[1] Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons that follow, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion for remand (ECF Nos. 8 & 9) be DENIED; that Defendant's motion for summary judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Because Plaintiff complains that the ALJ erred when he did not assign controlling weight to the opinions of her treating neurologist and when he assessed her credibility, Plaintiff's physical maladies are relevant to the present case. As such, Plaintiff's medical history, the opinion of Plaintiff's treating physician and Plaintiff's testimony are summarized below.

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

**A.    Plaintiff's Education and Work History**

While Plaintiff did not graduate from high school, she earned a GED. (R. at 418.) Plaintiff also completed training for and obtained a commercial driver's license ("CDL"). (R. at 418.) She previously worked as a courier and school bus driver. (R. at 418.) Plaintiff admitted to laundering students' clothing for money for some time in 2009-2010. (R. at 35-36, 914.) As an adult, Plaintiff was convicted of credit card fraud. (R. at 705.)

**B.    Plaintiff's Medical Records**

On October 19, 2007, an MRI of Plaintiff's head indicated "better defined and minimally larger" white matter consistent with Plaintiff's diagnosis of MS. (R. at 569.) A week later, Plaintiff visited Ibrahim Hegab, M.D., Plaintiff's treating neurologist, because Plaintiff's gastrointestinal physician requested that Plaintiff's oxycodone dosage be lowered. (R. at 560-62.) At that time, Plaintiff admitted to drinking on a regular basis as well as marijuana use. (R. at 560-62.) An examination found that Plaintiff had a full range of motion with 4/5 or 5/5 muscle strength and 3+ reflexes. (R. at 560-62.) Dr. Hegab diagnosed Plaintiff with MS, chronic low back pain, chronic pain syndrome and cervical radiculitis. (R. at 562.)

On December 2, 2007, Dr. Hegab indicated that Plaintiff had been diagnosed with MS in 2004 and had undergone carpal tunnel surgery on her right hand. (R. at 557.) Plaintiff admitted to drinking on a regular basis and marijuana usage. (R. at 557-58.) Plaintiff had a full range of motion with 4/5 or 5/5 muscle strength and 3+ reflexes. (R. at 558-59.) Later that month, an MRI of Plaintiff's lumbar spine indicated "small left central protrusion and small right lateral protrusion patterns of disc herniation causing mild right neural foraminal stenosis" as well as right facet osteoarthritis. (R. at 509.) An MRI of Plaintiff's spine with contrast revealed "no enhancing plaque . . . to suggest active" MS. (R. at 510.)

3

On February 11, 2008, Plaintiff visited Dr. Hegab and admitted to marijuana use. (R. at 552-53.) Plaintiff had a full range of motion, 5/5 muscle strength, 2+ reflexes as well as a fluid and balanced gait with good arm swing. (R. at 552-53.) Dr. Hegab diagnosed Plaintiff with MS, cervical stenosis, peripheral neuropathy, chronic low back pain and chronic pain syndrome. (R. at 553.)

A few weeks later, Dr. Hegab conducted a study of Plaintiff's nerves and diagnosed Plaintiff with cervical radiculopathy of the lower cervical levels and carpal tunnel syndrome. (R. at 548.) On April 24, 2008, Plaintiff visited Eric K. Oberlander, M.D., a neurosurgeon, and complained of pain rated an eight out of 10 in her neck and right shoulder as well as in her right arm. (R. at 564.) Dr. Oberland recorded Plaintiff's muscle strength in her arms and shoulders as 5/5 with a full range of motion against resistance. (R. at 564.) Plaintiff also had 2+ reflexes and was educated on a surgical option for her pain. (R. at 564-55.) On May 27, 2008, an MRI of Plaintiff's brain indicated "[p]robable arteriosclerotic gliosis although [MS] or other demyelinating pathology could cause a similar pattern. No definite change from the 2004 MRI." (R. at 622.)

In June, July and September 2008, Dr. Hegab observed Plaintiff's muscle strength as a 5/5 with a full range of motion and 2+ or 3+ reflexes. (R. at 668-73, 776-71.) Dr. Hegab also documented Plaintiff's marijuana usage. (R. at 668-73, 776-71.) During this time, Plaintiff told a therapist that she was "'medicating herself' with marijuana" on a consistent basis. (R. at 776.) On September 25, 2009, an MRI of Plaintiff's cervical spine indicated that Plaintiff had a demyelinating disease, multilevel degenerative changes with her disc herniation, spinal stenosis and neural foraminal narrowing. (R. at 800.) The MRI of Plaintiff's head revealed no enhancing or new lesions. (R. at 869.)

During her near-monthly visits to Durgado Basavaraj, Plaintiff's treating neurologist between December 2008 and February 2011, Plaintiff complained of neck pain rated at a four out of ten while on medication and a seven out of ten while working or performing physical activity. (R. at 834, 837, 848, 853, 858, 862, 866, 873, 876, 879, 882, 885, 890, 893, 899, 903, 967-80.) Dr. Basavaraj noted normal range of motions in Plaintiff's joints, 5/5 muscle strength and normal reflexes. (R. at 834, 837, 848, 853, 858, 862, 866, 873, 876, 879, 882, 885, 890, 893, 899, 903, 967-80.) In July 2009, he urged Plaintiff to reduce her Percocet usage, because her MS was stable. (R. at 879.) Dr. Basavaraj documented that Plaintiff started water aerobics in or about July 2010. (R. at 834, 837.)

C.     **The Opinions of Dr. Hegab, Plaintiff's Treating Neurologist**

On February 13, 2008, Dr. Hegab completed a Medical Report for General Relief and indicated that Plaintiff's MS severely rendered her unable to work for 12 months. (R. at 545.) Dr. Hegab wrote that Plaintiff's treatment plan was to see her neurologist. (R. at 545.)

On February 3, 2010, Dr. Hegab completed a Medical Assessment of Ability to do Work-Related Activities. (R. at 803-06.) Dr. Hegab wrote that Plaintiff could only lift or carry 10 pounds, stand or walk a total of two hours in 30 minute intervals with 15 minute rests during an eight-hour work day, sit a total of two hours in 30 minute intervals during an eight-hour work day and she could never climb, balance, stoop, crouch, kneel or crawl. (R. at 803-04.)

Dr. Hegab marked that Plaintiff's ailments affected her ability to feel, push/pull as well as see and that Plaintiff was restricted from heights, moving machinery, temperature extremes, fumes and humidity. (R. at 805.) He listed Plaintiff's lower back pain, left sciatic pain, cervical and lumbar spondylosis, MS and morbid obesity as medical findings that supported his assessments. (R. at 803-05.) Dr. Hegab diagnosed Plaintiff with MS, cervical spondylosis,

lumbar spondylosis as well as carpal tunnel and opined that Plaintiff had these limitations since March 1, 2007. (R. at 806.)

**D.      The Opinions of the Non-treating State Agency Physicians**

On September 11, 2008, Dr. James Wickham, a non-treating state agency physician completed a Physical RFC Assessment. (R. at 697-703.) Dr. Wickham concluded that Plaintiff had exertional limitations that allowed her to occasionally carry 20 pounds, frequently carry 10 pounds and sit, stand or walk for six hours at a time in an eight-hour day. (R. at 698.) Plaintiff had no postural, manipulative, visual, communicative or environmental limitations and could perform light work. (R. at 696, 699-700.) Dr. Wickham diagnosed Plaintiff with cervical spondylosis with radiculopathy, left carpal tunnel and MS. (R. at 702.) On July 2, 2009, non-treating state agency physician Dr. Robert Chaplin affirmed Dr. Wickham's assessment. (*See* R. at 97-98.) On December 10, 2010, Dr. Martin Cader, a non-treating state agency physician, agreed mostly with the previous non-treating state agency physicians' assessments, but also limited Plaintiff to avoid concentrated exposure to hazards and occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 931-37.)

**E.      Plaintiff's Testimony**

On July 23, 2008, Plaintiff completed a Function Report and indicated that she lived in a house with her family and friends. (R. at 319.) Plaintiff wrote that she watched television, went to the doctors, cleaned the house, cooked and put clothes in the washer. (R. at 319.) She noted that she did not take care of anyone else, but did take care of her dog. (R. at 320.) Plaintiff marked that she could go out alone and drive. (R. at 322.) She left the house to go shopping or to go doctors' appointments. (R. at 322-23.)

Plaintiff slept "all the time," would wake up in pain and had "a hard time getting up." (R. at 320.) She indicated that she was limited in lifting, squatting, bending, reaching, walking, sitting as well as stair climbing. (R. at 324.) Plaintiff wrote that she could only walk a half a block, was scared of walking down stairs, occasionally used a cane and used a brace for her carpal tunnel. (R. at 324-25.) Plaintiff also completed two more Function Reports that were consistent with the first one. (R. at 377-84; 453-61.)

On July 24, 2008, Plaintiff completed a Pain Questionnaire and indicated that she had aching, stabbing, burning and throbbing pain on her lower back, shoulders, arms, neck, head, eyes as well as hands. (R. at 337.) She indicated that her lower back and calves hurt when she walked. (R. at 337.) She believed that her pain was partly from her MS. (R. at 337.) Plaintiff wrote that she took Oxycodone, Lyrica, Tizanidine and Advil for her pain, but the medications made her constipated, sleepy and dizzy. (R. at 338.) Plaintiff also completed two more Pain Questionnaires that were consistent with the first one. (R. at 374-75; 440-41.)

On July 24, 2008, Plaintiff completed a Fatigue Questionnaire in which she wrote that she felt like she aged overnight. (R. at 340.) Plaintiff felt useless and weak with heavy arms and legs. (R. at 340.) She indicated that she did not want to complete tasks and that it took her hours to perform a simple chore. (R. at 340.) Plaintiff also completed another Fatigue Questionnaire that was consistent with the first one. (R. at 386-90.)

On August 4, 2008, Plaintiff's daughter, Juleah L. Murphy, completed a Third Party Function Report and wrote that Plaintiff watched television, performed some limited housework and made frozen dinners. (R. at 343-44.) Ms. Murphy indicated that she helped take care of Plaintiff, her dog, and the house. (R. at 344.) She noted that Plaintiff slept all the time and was always in pain. (R. at 345.) Plaintiff cooked dinner daily and washed clothes. (R. at 346.)

Plaintiff could drive short distances alone, but not at night, and generally only left the house for doctors' appointments. (R. at 347, 349.) Ms. Murphy noted that Plaintiff was limited with lifting, standing, walking, sitting, stair climbing, kneeling, squatting, reaching, using her hands, bending, seeing as well as completing tasks and could not sit, stand or walk for long periods of time. (R. at 349-50.) Plaintiff wore a brace and used a cane occasionally. (R. at 351.)

On August 19, 2010, Plaintiff's mother, Barbara P. Nicklis, completed a Function Report in which she wrote that she and Plaintiff babysat Plaintiff's grandchild around 25 hours a week. (R. at 425-35.) Ms. Nicklis indicated that Plaintiff performed light housework, watched television, prepared sandwiches or frozen meals, laundered and took care of her grandchild and animals. (R. at 426, 428.) Ms. Nicklis noted that Plaintiff's illnesses caused her "to sleep more than she should." (R. at 427.) Plaintiff left the house five days a week to help her mother babysit. (R. at 429.) Plaintiff drove alone and shopped once a week. (R. at 429-30.) Ms. Nicklis also wrote that Plaintiff's hands and arms occasionally ached and that Plaintiff could only walk a quarter of a block. (R. at 432.)

On February 10, 2010, Plaintiff testified before the ALJ. (R. at 59-86.) Plaintiff stated that she slept about 18 hours a day and kept her belongings downstairs in a two-level house. (R. at 67, 75.) She testified that she was 5'5" tall and weighed 250 pounds. (R. at 67.) She admitted to using marijuana a week before the hearing, but stated that she did not buy it. (R. at 80.)

Plaintiff previously worked as a courier and a school bus driver, but no longer had her CDL. (R. at 69-70.) She indicated that she did not drive and had not worked since her alleged onset date. (R. at 68.) Plaintiff testified that she did not shop for groceries, prepare food, clean, babysit her granddaughter or perform yard work. (R. at 75.)

Plaintiff testified that she had gotten injections to manage her pain and had been on pain medication for her neck, lower back as well as hips. (R. at 70-71.) While she testified that the medications helped reduce her pain to a rating of a three or four out of ten, her pain elevated to a five or six out of ten after her doctor lowered her dosage. (R. at 71-72.) Side effects from her medication included headaches, constipation and digestion problems. (R. at 76-77.) Plaintiff stated she could pour milk from a half gallon container, stand for 10-15 minutes at a time, sit for about an hour at a time and walk across a street before stopping. (R. at 72-73.) She was prescribed a brace for carpal tunnel syndrome on her left hand in 2007 and wore it mostly every day. (R. at 73.)

Although Plaintiff was recommended for physical therapy, she stopped after a few sessions, because she did not want to "hurt more than [she] did before she went." (R. at 77.) She was also recommended to undergo neck surgery, but declined. (R. at 77-78.) Plaintiff testified that her treating neurologist told her not to bend, climb, balance or use heavy machinery. (R. at 78.)

On April 8, 2011, Plaintiff testified again before the ALJ . (R. at 31-58.) Plaintiff stated that she lived with her daughter and granddaughter. (R. at 34.) Plaintiff had a two-level house, but she lived downstairs and her daughter lived upstairs. (R. at 35.) She testified that she had not worked anywhere "for a single day or a single dollar," but later admitted to laundering students' clothing for money for some time, but stated that she had stopped over a year before the hearing. (R. at 35-36.) Plaintiff drove a few times a week, grocery shopped, cooked for her family, cleaned and took care of her granddaughter with her mother. (R. at 36-37.)

Plaintiff admitted to the ALJ that she had smoked marijuana before the hearing and that she smoked marijuana daily. (R. at 37.) She started smoking marijuana in 2005 and did not

smoke it when she was working. (R. at 44-45.) Plaintiff obtained the marijuana from her

boyfriend. (R. at 38.) She testified that she functioned better with marijuana and that it helped

her deal with things as well as made her "more attentive to the things" that she needed to think

about. (R. at 43-44.) Plaintiff tended to wear jogging clothes most of the time, did not finish

tasks, procrastinated and stayed in her recliner due to her depression. (R. at 40-41.)

## II. PROCEDURAL HISTORY

Plaintiff protectively filed for DIB and SSI on June 1, 2008, claiming disability due to

MS, a herniated disc in her neck, depression, degenerative disc disease and carpal tunnel

syndrome with an alleged onset date of March 1, 2007, which was later amended to September

29, 2007. (R. at 16, 66, 120-31, 305, 309.) The Social Security Administration ("SSA") denied

Plaintiff's claims initially and on reconsideration.[2] (R. at 159-69, 172-76.) On February 10,

2010, Plaintiff testified before an ALJ. (R. at 59-86.) On March 26, 2010, the ALJ issued a

decision finding that Plaintiff was not disabled. (R. at 132-45.) The Appeals Counsel remanded

Plaintiff's claim to the ALJ on October 25, 2010, to obtain testimony from a VE. (R. at 151-45.)

On April 8, 2011, the ALJ held another hearing and, on April 13, 2011, issued another decision

finding that Plaintiff was not disabled under the Act. (R. at 13-58.) The Appeals Council

subsequently denied Plaintiff's request to review the ALJ's decision on August 8, 2011, making

the ALJ's decision the final decision of the Commissioner subject to judicial review by this

Court. (*See* R. at 1-3.)

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404, subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

### III. QUESTIONS PRESENTED

Was the Commissioner's evaluation of the opinions of Plaintiff's treating physician supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation omitted) (internal quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by

11

substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in

---

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5).  The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE").  When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform.  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful."  *Id.*  If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits.  20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since September 29, 2007.  (R. at 19.)  At step two, the ALJ determined that Plaintiff was severely impaired from MS, degenerative disc disease of the cervical and lumbosacral spine, obesity, depression and marijuana abuse.  (R. at 19-20.)  At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1.  (R. at 20-22.)

The ALJ then determined that Plaintiff had the RFC to perform light work, "except that she [was] limited to occasional bending, pushing, pulling, crawling, kneeling and squatting.  She should avoid working around hazards such as unprotected heights and/or dangerous or moving machinery.  Due to her depression, pain medication side effects and marijuana abuse, she [was] limited to performing simple, unskilled work."  (R. at 22.)

14

The ALJ then summarized Plaintiff's statements, which included complaints of pain and stiffness in Plaintiff's head, neck, shoulders, arms, back and hips. (R. a 23.) Plaintiff noted that she had trouble with her vision and picking up items. (R. at 23.) The ALJ summarized Plaintiff's allegations that she could not lift, squat, bend, stand, reach, walk, sit, kneel, climb, see, remember, complete tasks, concentrate, understand, follow instructions or use her hands. (R. at 23.) Plaintiff asserted that she had an aching, stabbing, burning and throbbing pain. (R. at 23.) Her medications caused constipation, drowsiness as well as dizziness. (R. at 23.) She also indicated that she slept 10 to 12 hours a night, felt useless, could only walk half a block and could not sit or stand for long periods of time. (R. at 23.) Plaintiff was able to perform household chores, take care of herself, prepare meals, drive, shop, pay bills and help care for her granddaughter. (R. at 23.)

Plaintiff's prescription medications included Oxycodone, morphine and Cymbalta. (R. at 23-24.) After her doctor reduced her pain medication, Plaintiff indicated that her pain increased to a five or six out of 10 from a three or four with medication. (R. at 24.) Plaintiff testified that she could stand for 10 to 15 minutes, sit for an hour and that it hurt to pour a glass of milk. (R. at 24.) Plaintiff decided against having neck surgery and was advised to avoid bending, climbing and balancing. (R. at 24.) The ALJ summarized that Plaintiff could drive a few times a week, shop, prepare meals, clean and babysit her granddaughter with her mother's help. (R. at 24.) Plaintiff used marijuana daily. (R. at 24.) Finally, Plaintiff indicated that she was depressed and spent most of her days in her recliner due to her pain. (R. at 24.) The ALJ assessed that Plaintiff's ADLs, medical records, conservative nature of treatment and daily marijuana use diminished her credibility. (R. at 27.)

The ALJ then summarized Plaintiff's medical records, which included a diagnosis of MS by Dr. Hegab. (R. at 24.) While the ALJ acknowledged Dr. Hegab's February 13, 2008 opinion that Plaintiff was totally disabled from MS, he also summarized the patient notes from a few days earlier, which noted a normal neurological exam, full strength in the extremities as well as normal sensation, coordination and gait. (R. at 24-25.) On February 3, 2010, Dr. Hegab opined that Plaintiff had the RFC for less than a full range of sedentary work and could only stand or walk for two hours, sit for two hours as well as lift or carry 10 pounds. (R. at 25.) Dr. Hegab also limited Plaintiff to perform no postural maneuvers, no work around heights and no work around moving machinery, temperature extremes or humidity. (R. at 25.) The ALJ also noted that Plaintiff's MS was treated with medication and did not produce any neurological deficits, as evaluated by Dr. Hegab. (R. at 27.)

The non-treating state agency physician opinions concluded that Plaintiff had the RFC for light work with occasionally climbing, balancing, stooping, kneeling, crouching and crawling with no exposure to heights or moving machinery. (R. at 27.) The ALJ assigned these opinions "some, but not controlling, weight." (R. at 27.) Because the treatment records of Dr. Hegab and Dr. Basavaraj did not support Dr. Hegab's opinions, the ALJ assigned Dr. Hegab's opinions minimal weight. (R. at 28.) Finally, the ALJ assigned the consultative psychologist limited weight to her opinion that Plaintiff could perform simple, repetitive tasks and that her symptoms might interfere with work attendance, require additional supervision and interrupt with her ability to complete a normal workday or workweek. (R. at 28.)

At step four, the ALJ assessed that Plaintiff was unable to perform any past relevant work. (R. at 28.) Next, considering Plaintiff's age, high school equivalent education, ability to speak English, work experience and RFC, the ALJ determined that there were jobs that existed in

16

significant numbers in the national economy that Plaintiff could perform. (R. at 29.) The ALJ

therefore found that Plaintiff had not been under a disability under the Act from September 29,

2007. (R. at 30.)

Plaintiff complains that the ALJ did not assign her treating neurologist controlling

weight. (Pl.'s Mem. at 8-12.) Next, Plaintiff asserts that substantial evidence did not support the

ALJ's credibility determination and that the ALJ improperly failed to quantify Plaintiff's

participation in her ADLs. (Pl.'s Mem. at 12-15.) In contrast, the Commissioner asserts that

substantial evidence supported the ALJ's decisions. (Def.'s Mem. in Supp. of Mot. for Summ. J.

("Def.'s Mem.") at 10-17.)

## A.      Substantial evidence supported the ALJ's assignment of weight to the medical opinions.

During the sequential analysis, when the ALJ determines whether the claimant has a

medically-determinable severe impairment, or combination of impairments which would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered.

*See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions,

including those from the Plaintiff's treating physicians, consultative examiners or other sources

that are consistent with each other, then the ALJ makes a determination based on that evidence.

*See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be

given controlling weight if: (1) it is well-supported by medically-acceptable clinical and

laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

Plaintiff argues that there was overwhelming objective evidence that supported the opinions of Plaintiff's treating neurologist. (Pl.'s Mem. at 8-12.) Plaintiff's claim is unsupported by the vast substantial evidence — much of which is more recent than Dr. Hegab's opinions — that document Plaintiff's normal range of motions, 5/5 muscle strength, normal reflexes as well as a reduction in prescription pain medication. (R. at 834, 837, 848, 853, 858, 862, 866, 873, 876, 879, 882, 885, 890, 893, 899, 903, 967-80.) Similarly, Dr. Hegab's patient notes indicate that Plaintiff had a full range of motion, 5/5 muscle strength, 2+ or 3+ reflexes as well as a fluid and balanced gait with good arm swing. (R. at 552-53, 558-59, 668-73, 766-71.) Additionally, Plaintiff's medical records noted that her MS was generally stable — so much so that Plaintiff's doctors reduced her pain medications. (*See* R. at 510, 622, 869, 879.) A reduction in pain medication indicates a conservative treatment plan.

As the ALJ adroitly noted, Dr. Hegab's February 2008 opinion — which classified Plaintiff as unable to work — was unsupported and contradicted by his February 2008 patient notes, which indicated that Plaintiff had a full range of motion, 5/5 muscle strength, 2+ reflexes as well as a fluid and balanced gait with good arm swing. (R. at 552-53, 545.) Similarly, a

patient who was unable to walk, sit or stand for more than 30 minutes at a time could not participate in water aerobics. (*See* R. at 803-04, 834, 837.)  Despite these inconsistencies and a lack of substantial evidence in the record to assign Dr. Hegab's opinions controlling weight, the ALJ did assess limitations in Plaintiff's RFC of light work, such that she was limited "to occasional bending, pushing, pulling, crawling, kneeling and squatting" and "should avoid working around hazards such as unprotected heights and/or dangerous or moving machinery." (R. at 22.)  This assessment was similar to Dr. Cader's RFC assessment and incorporated some of Dr. Hegab's opinion. (*See* R. at 803-05, 931-37.)

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)).  Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."[6]  *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2).  Because Dr. Hegab's opinions were inconsistent with substantial evidence, the ALJ did not err in assigning less than controlling weight to the opinions of Plaintiff's treating neurologist.

---

[6] If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006).

**B.      Substantial evidence supported the ALJ's evaluation of Plaintiff's credibility.**

After step three of the ALJ's sequential analysis, but before deciding whether a claimant

can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20

C.F.R. §§ 416.920(e)-(f), 416.945(a)(1).  The RFC must incorporate impairments supported by

the objective medical evidence in the record and those impairments that are based on the

claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.

*Craig v. Charter*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* SSR 96-7p; 20 C.F.R.

§§ 404.1529(a) and 416.929(a).  The first step is to determine whether there is an underlying

medically determinable physical or mental impairment or impairments that reasonably could

produce the individual's pain or other related symptoms.  *Id.*; SSR 96-7p, at 1-3.  The ALJ must

consider all the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3;

*see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on all of

the relevant evidence in the case record").  If the underlying impairment reasonably could be

expected to produce the individual's pain, then the second part of the analysis requires the ALJ

to evaluate a claimant's statements about the intensity and persistence of the pain and the extent

to which it affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation

must take into account "all the available evidence," including a credibility finding of the

claimant's statements regarding the extent of the symptoms and the ALJ must provide specific

reasons for the weight given to the individual's statements.  *Craig*, 76 F.3d 595-96; SSR 96-7p,

at 5-6, 11.

Plaintiff argues that the facts in this case are "the same" as the facts in *Windsor v. Astrue*, No. 3:06-cv-00664 (E.D. Va. filed May 8, 2007),[7] where the court found that the ALJ did not adequately portray the plaintiff's participation level in her activities. (Pl.'s Mem. at 14-15.) Plaintiff complains further that the ALJ did not elicit testimony to indicate the participation level in her ADLs. (Pl.'s Mem. at 13-14.) However, in his credibility discussion, the ALJ cited to the very exhibits in the record that contain both the general activities and the Plaintiff's specific alleged limitations. (R. at 23-24.) Therefore, the ALJ considered Plaintiff's limitations as recorded in her Function Reports in his analysis by reference.

Moreover, *Windsor* is distinguishable from the instant case. In *Windsor*, the ALJ failed to support his reasoning for any factor that he used in evaluating the plaintiff's credibility and the medical opinions. *Windsor*, No. 3:06-cv-664 at pp. 9-13. Though the ALJ concluded that the plaintiff's subjective complaints were unsupported by objective medical evidence and were inconsistent with other evidence of record, the *Windsor* court found that the ALJ did "not provide any specifics to inform the Court what inconsistencies he is referring to and what subjective complaints are not supported by the medical evidence of record." *Id.* at 13. Hence, the court in *Windsor* scrutinized the ALJ's conclusion regarding the plaintiff's ADLs as part of a continuing effort to find support for his credibility determination.

*Windsor* is inapplicable here, however, because the ALJ's credibility determination was buttressed by Plaintiff's statements, which were inconsistent with her daughter's and mother's statements. More specifically, Plaintiff indicated that she slept most of the day on her recliner, but Plaintiff's mother indicated that she babysat with Plaintiff about 25 hours a week and Plaintiff's daughter indicated that Plaintiff prepared dinner nightly. (R. at 75, 346, 429.)

---

[7] Plaintiff attached this unpublished and unreported Report and Recommendation to her Memorandum in Support of her Motion for Summary Judgment, EFC No. 10, exh. 2.

Similarly, while Plaintiff testified that she was in her recliner throughout the day, she also told her doctor that she began participating in water aerobics in July 2010. (R. at 40-41, 834, 837.) Additionally, Plaintiff admitted that she was self-medicating with marijuana (R. at 776); consequently, her marijuana use, and not her medical maladies, could have accounted for her constant sleeping and inability to complete tasks, (R. at 320, 340), which would, in turn, reduce her credibility. Finally, as discussed above, Plaintiff's medical treatment was conservative in nature and, despite her diagnosis of MS, her patient notes reflected normal range of motions, 5/5 muscle strength, normal reflexes as well as a reduction in prescription pain medication. (R. at 834, 837, 848, 853, 858, 862, 866, 873, 876, 879, 882, 885, 890, 893, 899, 903, 967-80.)

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Because substantial evidence supported his decision, the ALJ did not err in reaching his credibility evaluation.

22

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's motion for summary judgment and motion for remand (ECF Nos. 8 & 9) be DENIED; that Defendant's motion for summary judgment (ECF No. 11) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable John A. Gibney, Jr. and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

                                           /s/

                                     David J. Novak
                                     United States Magistrate Judge

Richmond, Virginia
Dated:_ August 27, 2012